404 F.3d 688
 In re CHARGES OF JUDICIAL MISCONDUCT.
 Docket No. 04-8529.
 Docket No. 04-8530.
 Docket No. 04-8541.
 Docket No. 04-8547.
 Docket No. 04-8553.
 
 1
 Judicial Council of the Second Circuit.
 
 
 2
 April 8, 2005.
 
 
 3
 COPYRIGHT MATERIAL OMITTED Before: The Judicial Council of the Second Circuit.
 
 Memorandum and Order
 
 4
 In June, July, August and September 2004, five complaints of judicial misconduct were filed against a circuit judge of this Circuit ("the Judge") pursuant to 28 U.S.C. § 351 and the Rules of the Judicial Council of the Second Circuit Governing Complaints Against Judicial Officers ("the Local Rules").
 
 
 5
 Pursuant to 28 U.S.C. § 353(a) and Local Rule 9, Acting Chief Judge Dennis Jacobs (designated following the recusal of Chief Judge John M. Walker, Jr.) appointed a special committee to investigate the allegations in the above-referenced complaints. The special committee ("the Committee") consisted of the Acting Chief Judge, Circuit Judge Joseph M. McLaughlin, and District Judge Carol B. Amon of the Eastern District of New York. Michael Zachary, a supervisory staff attorney for the Court of Appeals, was appointed counsel to the Committee pursuant to Local Rule 10(c). The Committee submitted a report to the Judicial Council of the Second Circuit, pursuant to 28 U.S.C. § 353(c) and Rule 10(e) of the Local Rules. The report was based on a thorough review of the complaints, the evidence submitted by the complainants and by the Judge, the relevant canons and authorities, and responses from the Judge written at the invitation of the Acting Chief Judge.
 
 
 6
 All five complaints present one or more misconduct claims concerning the substance of the Judge's June 19, 2004 remarks at an American Constitutional Society convention event ("the ACS remarks"); one complaint further alleges that speaking at that convention, without regard to the substance of the remarks, constituted prohibited political activity; and one complaint further alleges misconduct inferred from certain statements alleged to have been made by the Judge's wife at a May 23, 2004 political demonstration at Yale University.
 
 
 7
 * The ACS remarks at issue were made after a panel discussion entitled "The Election: What's at Stake for American Law and Policy." The Judge spoke from the floor as a non-panelist. The remarks and context are as follows:
 
 
 8
 Okay, I'm a judge and so I'm not allowed to talk politics and so I'm not going to talk about some of the issues which were mentioned or what some have said is the extraordinary record of incompetence of this administration at any number of levels, nor am I going to talk about what is really a difficult issue which is the education issue, which is an incredibly complicated one, which I'm glad you talked about. I'm going to talk about a deeper structural issue that is at stake in this election, and that has to do with the fact that in a way that occurred before but is rare in the United States, that somebody came to power as a result of the illegitimate acts of a legitimate institution that had the right to put somebody in power. That is what the Supreme Court did in Bush versus Gore. It put somebody in power. Now, he might have won anyway, he might not have, but what happened was that an illegitimate act by an institution that had the legitimate right to put somebody in power. The reason I emphasize that is because that is exactly what happened when Mussolini was put in by the King of Italy, that is, the King of Italy had the right to put Mussolini in though he had not won an election and make him Prime Minister. That is what happened when Hindenburg put Hitler in. I'm not suggesting for a moment that Bush is Hitler. I want to be clear on that, but it is a situation which is extremely unusual. When somebody has come in in that way they sometimes have tried not to exercise much power. In this case, like Mussolini, he has exercised extraordinary power. He has exercised power, claimed power for himself that has not occurred since Franklin Roosevelt, who after all was elected big and who did some of the same things with respect to assertions of power in time of crisis that this President is doing. It seems to me that one of the things that is at stake is the assertion by the democracy that when that has happened it is important to put that person out, regardless of policies, regardless of anything else, as a statement that the democracy reasserts its power over somebody who has come in and then has used the office to take ... build himself up. That is what happened after 1876 when Hayes could not even run again. That is not what happened in Italy because, in fact, the person who was put in there was able to say "I have done all sorts of things and therefore deserve to win the next election." That's got nothing to do with the politics of it. It's got to do with the structural reassertion of democracy. Thank you.
 
 
 9
 By letter to Chief Judge Walker dated June 24, 2004, the Judge apologized for the ACS remarks: I write you as Chief Judge to express my profound regret for my comments at last weekend's American Constitution Society Conference. My remarks were extemporaneous and, in hindsight, reasonably could be — and indeed have been — understood to do something which I did not intend, that is, take a partisan position.
 
 
 10
 As you know, I strongly deplore the politicization of the judiciary and firmly believe that judges should not publicly support candidates or take political stands. Although what I was trying to do was make a rather complicated academic argument about the nature of reelections after highly contested original elections, that is not the way my words, understandably, have been taken. I can also see why this occurred, despite my statements at the time that what I was saying should not be construed in a partisan way. For that I am deeply sorry. I will not take the time here to outline the non-partisan theoretical framework I was trying to develop. In retrospect, I fear that is properly the stuff only of an academic seminar. For, whatever I had in mind, what I actually said was too easily taken as partisan. That is something which judges should do their best to avoid, and there, I clearly failed.
 
 
 11
 Again, I am truly sorry and apologize profusely for the episode and most particularly for any embarrassment my remarks may have caused you, my colleagues, and the court.
 
 
 12
 You should feel free to share this letter with our colleagues.
 
 
 13
 Chief Judge Walker forwarded the Judge's June 24 letter to the other members of the Second Circuit Court of Appeals, with a memorandum of his own, which stated the following:
 
 
 14
 Although [the] remarks were presented as an academic point with various historical analogies, the principal issue his remarks presents has nothing to do with the merits of what he said nor with his intent in saying them. The issue is whether his remarks could reasonably be understood as a partisan political comment. Partisan political comments, of course, are violations of the Code of Judicial Conduct. As [the Judge] has acknowledged, his remarks reasonably could be — and indeed have been — so understood, whatever his intent. He has sent me the enclosed letter, which he has urged me to share with the members of the Court.
 
 
 15
 I am pleased that [the Judge] has promptly recognized that his remarks could too easily be taken as partisan and hence were inappropriate, and I urge all members of the Court to exercise care at all times, but especially in an election year, to refrain from any conduct or statements that could reasonably be understood as "political activity" or "publicly endors[ing] or oppos[ing] a candidate for public office."
 
 
 16
 The next day, the Judge's June 24 letter and Chief Judge Walker's June 24 memorandum were released to the press, with the express approval of the Judge.
 
 II
 
 17
 We first consider the claim that the Judge's presence and participation at an event of the ACS is in itself a breach of ethics. Next, we consider the several claims premised on the substance of the Judge's remarks. Last, we consider the claim based on statements attributed to the Judge's wife at the Yale Protest.
 
 A. Speaking at the ACS Conference
 
 18
 The complaint docketed under 04-8547 claims that, regardless of the content of the Judge's remarks, the fact that he spoke at all at the ACS convention violated the Canon 7 prohibition against political activity and making speeches for a political organization. See Canon 7(A)(2)("A judge should not ... make speeches for a political organization..."). It is alleged in the complaint that the ACS is, "by definition[,] left-leaning and [has] always had a partisan mission and agenda."
 
 
 19
 The ACS describes itself on its web site, found at www.acslaw.org, as a "progressive legal organization" which seeks to counter "a narrow, conservative approach to the law" that (it asserts) "has come to dominate American law and public law." According to the web site, contributions to the ACS are tax-deductible; it "is a non-partisan, non-profit 501(c)(3) educational organization"; and it does "not, as an organization, lobby, litigate, or take positions on specific issues, cases, legislation, or nominations." A review of the various events listed on the web site supports the allegation that the ACS mission is "left-leaning," but it also reveals that speakers at the listed events appear to be from across the political spectrum.
 
 
 20
 The claim that speaking at an ACS event constitutes political activity does not withstand analysis under Canon 7. The phrase "political organization" in Canon 7(A)(2) likely refers to groups organized primarily for political purposes, such as political parties, rather than to groups organized primarily for other purposes, such as legal education or debate, even if there is sympathy between a particular group or its mission and partisan entities. This distinction is suggested by Canon 7(C), which states: "A judge should not engage in any other political activity [referring to activities specified in 7(A) and (B)]; provided, however, this should not prevent a judge from engaging in the activities described in Canon 4." Canon 4 in turn provides: "[a] judge may engage in extra-judicial activities to improve the law, the legal system, and the administration of justice." Among other things permitted by Canon 4, "[a] judge may speak, write, lecture, teach, and participate in other activities concerning the law, the legal system, and the administration of justice." Canon 4(A). The Commentary to Canon 4 states:
 
 
 21
 [a]s a judicial officer and person specially learned in the law, a judge is in a unique position to contribute to the improvement of the law, the legal system, and the administration of justice, including revision of substantive and procedural law and improvement of criminal and juvenile justice. To the extent that the judge's time permits, the judge is encouraged to do so, either independently or through a bar association, judicial conference, or other organization dedicated to the improvement of the law.
 
 
 22
 Canon 4 Commentary. "[T]o qualify as a Canon 4 activity, the activity must be directed toward the objective of improving the law, qua law, or improving the legal system or administration of justice, and not merely utilizing the law or the legal system as a means to achieve an underlying social, political, or civic objective." Judicial Conference of the United States, Committee on Codes of Conduct, Advisory Opinion 93, Extrajudicial Activities Under Canons 4 and 5, ¶ 3 (1977, last revised Oct. 1998). Because "judicial participation in Canon 4 activities is actively encouraged[,]... a judge will be given greater latitude when participating in extrajudicial activities expressly covered by Canon 4," id. at ¶ 2, but, when an activity is "politically oriented," Canon 4 activities are construed "narrowly, restricting them to activities that are most directly related to the law and legal process," id. at ¶ 13.
 
 
 23
 A judge may attend or speak at an event even if it is sponsored by a group that has an identifiable political or legal orientation or bias. It does not follow therefrom that the judge is an adherent of the group's political or legal mission, or a fellow traveler. See Judicial Conference of the United States, Committee on Codes of Conduct, Compendium of Selected Opinions, § 4.5(k) (2001)("A judge who is a member of the American Bar Association is not regarded as personally supporting positions taken by the Association without the judge's involvement."); Judicial Conference of the United States, Committee on Codes of Conduct, Advisory Opinion 93, Extrajudicial Activities Under Canons 4 and 5, ¶ 12 (1977, last revised Oct. 1998)("a judge may remain a member of a bar association which takes controversial positions on policy issues so long as the judge abstains from participating in the debate or vote on such matters in a manner in which the public may effectively become aware of the judge's abstention"). The ACS web site makes clear that various Supreme Court justices have attended and spoken at ACS events, and various panel members at the 2004 ACS convention and other ACS events stated or suggested that their political beliefs were opposed to the viewpoint attributed to the ACS by the complainants.[1] Legal organizations often invite speakers of divergent views as a means of fostering robust debate and attracting an audience. Balance in the roster of speakers or topics may be relevant to whether an event may be attended under Canon 4, but such balance is not required:
 
 
 24
 [t]he education of judges in various academic and law-related disciplines serves the public interest. That a lecture or seminar may emphasize a particular viewpoint or school of thought does not necessarily preclude a judge from attending. Judges are continually exposed to competing views and arguments and are trained to consider and analyze them. Yet, notwithstanding the general principle that judges may attend independent seminars..., there are instances in which attendance at such seminars would be inconsistent with the Code of Conduct. It is consequently essential for judges to assess each invitation on a case-by-case basis.
 
 
 25
 Judicial Conference of the United States, Committee on Codes of Conduct, Advisory Opinion 67, Attendance at Educational Seminars, ¶ 2 (1980, last revised Aug. 2004).
 
 
 26
 The Judge's presence at the ACS event, by itself, does not bespeak sympathy or support for the mission of the ACS, or for any of the speakers or groups represented at the event, because, among other reasons, the Judge's educational activities are by no means limited to groups generally aligned to the left, as a review of web sites confirms. See United States v. Pitera, 5 F.3d 624, 626-27 (2d Cir.1993) (judge's impartiality not reasonably questioned, for purposes of a recusal motion in criminal case, where she previously gave lecture to police/prosecutor drug enforcement task force "about steps they might take to increase the prospects for conviction in narcotics cases," in light of fact that lecture also included "several emphatic criticisms of prosecutors" and judge also participated in programs for defense lawyers and "commendably lectures to a variety of trial practice seminars").
 
 
 27
 For the foregoing reasons, the claim is dismissed.[2]
 
 B. The ACS Remarks
 
 28
 The following claims based on the ACS remarks are presented in one or more of the five complaints:
 
 
 29
 1. Advocacy that the President Not be Reelected. This claim is explicitly made in one complaint and is implicit in most of the others, as most of their allegations of political bias or political advocacy rely in part on the reelection-oriented portion of the remarks.
 
 
 30
 2. Comparing the President to Hitler and Mussolini. This claim is explicitly made in one complaint.
 
 
 31
 3. Political Bias or Engagement in Political Advocacy. Aside from the reelection-related claim, four of the complaints make the more general claim that the ACS remarks, or portions of them, demonstrate the Judge's "bigotry," political bias, or political advocacy.
 
 
 32
 4. Disagreement with Bush v. Gore. One complaint claims that this demonstrates incompetence.
 
 
 33
 We review these claims one by one. The general political advocacy allegations will be discussed in tandem with the reelection claim, as there is significant overlap between the two claims and, in any event, the same principles apply to both. The political bias claim will be discussed separately since it appears to be based on the independent, although questionable, principle that judges should not hold strong political beliefs.
 
 
 34
 1. Advocacy that the President not be Reelected.
 
 
 35
 Canon 7 states that judges "should refrain from political activity," and, specifically, that judges "should not ... publicly endorse or oppose a candidate for public office." Canon 7(A)(2). The Judge stated in his August 12, 2004 letter to Acting Chief Judge Jacobs that his remarks were reasonably understood as opposing a candidate in violation of Canon 7(A)(2). He also apologized for making the remarks, stated that he had not intended to make a partisan statement, and asserted that he has "every intention of seeing to it that such an episode does not happen again."
 
 
 36
 Under 28 U.S.C. § 354(a) and (b), when a Judicial Council finds that an Article III judge has engaged in judicial misconduct, the actions it may take include:
 
 
 37
 Ordering that, on a temporary basis, no further cases be assigned to the judge;
 
 
 38
 Censuring or reprimanding the judge by means of private communication;
 
 
 39
 Censuring or reprimanding the judge by means of public announcement;
 
 
 40
 Certifying disability of the judge pursuant to § 372(b);
 
 
 41
 Requesting that the judge voluntarily retire;
 
 
 42
 Referring the complaint, together with the record of any associated proceedings and recommendations for appropriate action, to the Judicial Conference of the United States; or
 
 
 43
 If the Judicial Council determines that the judge engaged in conduct which might constitute grounds for impeachment or which, in the interest of justice, is not amenable to resolution by the Judicial Council, certify that determination to the Judicial Conference of the United States.
 
 
 44
 See 28 U.S.C. § 354(a)-(b); Local Rules 14(a)-(g) and 15. Under Local Rule 14, the Judicial Council also may dismiss claims that do not state a misconduct claim under the applicable statutes, "conclude the proceeding" on the grounds that corrective action has been taken or intervening events have made action unnecessary, or order corrective action. See Local Rule 14(a)-(g). There is no definition of "censure" or "reprimand" or any other possible sanction in the misconduct statutes or Local Rules, or the case law and scholarly writing interpreting them. However, the use of those and related terms in the ethics rules of the United States Senate and House of Representatives provides some guidance.[3]
 
 
 45
 For the reasons that follow, the Judicial Council (a) finds that the Judge violated Canon 7 when he made the statement concerning the President's reelection, (b) concurs in Chief Judge Walker's July 24, 2004 admonition, and (c) concludes that the dissemination of Chief Judge Walker's admonition — together with the Judge's apology — and the Judicial Council's concurrence with the admonition, constitute both a sufficient sanction and corrective action.
 
 
 46
 The Commentary to Canon 1 of the Code of Conduct for United States Judges states that the question of "[w]hether disciplinary action is appropriate, and the degree of discipline to be imposed, should be determined through a reasonable application of the text [of the Code] and should depend on such factors as the seriousness of the violation, the intent of the judge, whether there is a pattern of improper activity, and the effect of the improper activity on others or on the judicial system." See also Leonard E. Gross, Judicial Speech: Discipline and the First Amendment, 36 Syracuse L.Rev. 1181, 1256-61 (1986) (discussing factors to be weighed when state or federal tribunals are choosing between possible disciplinary sanctions).
 
 
 47
 In the present instance, certain factors militate in favor of imposing some type of sanction: the violation of Canon 7 was clear and serious; and the remarks were made before a large public audience, and they were widely reported by the news media. On the other hand, there are significant mitigating factors: the Judge conceded that his remarks could reasonably be understood as violating Canon 7; he stated that the remarks were not planned and that he had not intended to veer into remarks that could be construed as partisan advocacy; he apologized and gave assurances that there will be no recurrence; Chief Judge Walker's admonition and the Judge's apology were released to the public; and there was wide media coverage of that admonition and apology.
 
 
 48
 There is little in the way of published case law or other guidance concerning when censure, reprimand, or other sanction is warranted. However, in cases where censure, reprimand, or suspension was ordered, the behavior at issue was, in general, appreciably more egregious than anything alleged in the current five complaints. See Report of the National Commission on Judicial Discipline and Removal, reprinted as appendix to Illustrative Rules Governing Complaints of Judicial Misconduct and Disability (Admin. Office of U.S. Courts 2000); Jeffrey N. Barr and Thomas E. Willging, Decentralized Self-Regulation, Accountability, and Judicial Independence Under the Federal Judicial Conduct and Disability Act of 1980, 142 U. Pa. L.Rev. 25 (1993). Cases involving allegations of improper partisan activity were "generally" resolved through corrective action. See Barr and Willging, supra, at 176. It appears that the corrective action usually took the form of the subject judge acknowledging the error or improper conduct and/or apologizing. Id. at 98, 100-01, 151-52.
 
 
 49
 We conclude that all of the purposes of the judicial misconduct provisions are fully served by: the Judge's apology; Chief Judge Walker's June 24, 2004 Memorandum; the release of that apology and Memorandum to the public; and the Judicial Council's concurrence with the admonition in the Memorandum. See id. at 106 ("the collective acts of the entire council are likely to have more credibility with complainants, the judge, and the public than the individual acts of a chief judge"). These actions constitute a sufficient sanction and appropriate corrective action.
 
 
 50
 Finally, in his June 24, 2004 letter of apology to Chief Judge Walker, the Judge suggested that his remarks were only contextually inappropriate, and that they were "properly the stuff only of an academic seminar." However, in response to the Committee's report, the Judge has acknowledged that the remarks also would have been inappropriate in an academic setting. Based on the Judge's acknowledgment, the Judicial Council concludes that no further action need be taken on that issue.
 
 
 51
 2. Comparing the President to Hitler and Mussolini.
 
 
 52
 The remarks concerning Hitler and Mussolini were cast in terms of the supposed similarity in how the President, Hitler and Mussolini gained power. However, the Judge went on to make a direct comparison between the President and Mussolini: "[i]n this case, like Mussolini, he [President Bush] has exercised extraordinary power." Under the circumstances, however, there is no need to parse these remarks. The Judge's August 12, 2004 letter to Acting Chief Judge Jacobs characterized the use of the Hitler and Mussolini examples as a mistake:
 
 
 53
 With respect to the examples of other situations where persons came into power as a result of the illegitimate act of a legitimate body, I unquestionably would have been much wiser to limit my examples to those from American history.... My use of the appointment of Mussolini and Hitler as examples — however much it may have been a natural, off-the-cuff example for someone with my childhood, and however much I meant it as a comparison of the Supreme Court's use of its power to that of Victor Emmanuel III and Hindenburg, and not at all a comparison of President Bush to the dictators — was obviously not so reported or read. That was reason enough for me to apologize, as I have said, "profusely" and "deeply." I stand by my apology completely.
 
 
 54
 The Hitler and Mussolini analogy is contextually subsumed in the reelection remarks, which are discussed above. See, e.g., Complaint docketed under 04-8541 (describing comparison as part of "a pattern of thinly disguised political advocacy"). No incremental action is required or justified. Moreover, even if the comparison remarks are treated as independent of the reelection remarks, no incremental action would be needed for the following reasons.
 
 
 55
 Although the comparison remarks were inflammatory to a reasonable person of ordinary sensibilities, it is not clear that they constituted judicial misconduct. In the complaint docketed under 04-8547, the complainants reasonably argue that the comparisons violated the Canon 1 requirement that judges maintain, enforce, and personally observe "high standards of conduct ... so that the integrity and independence of the judiciary may be maintained." However, there is no guidance in the Canons (which are advisory in any event) — and little elsewhere — on when out-of-court remarks that may be intemperate or disrespectful transcend the merely distasteful or the inadvisable and amount to misconduct. The available cases (mostly applying state canons to state court judges) reflect that sanctions have been imposed primarily for inappropriate remarks made in the courtroom, or for inappropriate out-of-court remarks more offensive than the comparison remarks, or for repeated instances. The cases involving federal judges who made questionable remarks outside the courtroom generally were resolved through corrective actions taken either before or after the filing of misconduct complaints; however, the available descriptions of those cases do not indicate whether a finding or acknowledgment of misconduct was made in conjunction with the corrective action. See Barr and Willging, supra, 142 U. Pa. L.Rev. at 66, 76, 98, 102, 176 (discussing federal misconduct proceedings); American Law Reports Annotation, Disciplinary Action Against Judge on Ground of Abusive or Intemperate Language or Conduct Toward Attorneys, Court Personnel, or Parties to or Witnesses in Actions, and the Like, 89 A.L.R.4th 278 (1991, 2004) (discussing state and federal cases); cf. Talbot D'Alemberte, Searching for the Limits of Judicial Free Speech, 61 Tul. L.Rev. 611, 612 (1987)(describing newspaper article which had reported that a Federal Bar Association ethics expert had opined that federal judge's public statement that President Reagan was a racist "probably didn't violate judicial ethical canons prohibiting federal judges from engaging in politics").
 
 
 56
 As part of the media coverage of the ACS remarks, at least one article reported on the opinions of several law professors concerning the ethical implications of those remarks. See Josh Gerstein, Judge's "Mussolini" Comments Violated Ethics, Critics Say, NEW YORK SUN, June 23, 2004. Professor Volokh of the University of California at Los Angeles School of Law, the only professor who distinguished between the reelection and comparison remarks, was reported as opining that the reelection remarks violated the Canon 7 prohibition against political advocacy, but that the "analogy to Hitler and Mussolini was factually inaccurate and unfair, but not a breach of ethics." Id. at last paragraph.
 
 
 57
 The Judicial Council concludes that no additional action is necessary based on the comparison language because the Judge acknowledged that the comparison was a mistake and has apologized for the ACS remarks, and because there is no precedent or authority clearly defining the comparison remarks as misconduct under the misconduct statutes or the Canons: "[m]any of the proscriptions in the Code are necessarily cast in general terms, and it is not suggested that disciplinary action is appropriate where reasonable judges might be uncertain as to whether or not the conduct is proscribed." Canon 1 Commentary at ¶ 3.
 
 
 58
 3. General Political Bias.
 
 
 59
 The general allegations of political bias, when considered separately from the political advocacy allegations, do not state a claim under Canon 7 or the misconduct statutes. Under Canon 7, a judge is free to have a preference or bias as between political candidates, and vote accordingly, as long as he or she does not publicly advocate for or against a candidate. To the extent that any of the complaints are based on the belief that a judge must be politically neutral or hold no strong political beliefs, they are without merit. To the extent that any of the complaints are based on the belief that the Judge's alleged bias renders him unable to sit as a judge in a case involving the President or any particular issue, they are (at least) premature as any such claim would await an actual instance. The general "political bias" claims are dismissed.
 
 
 60
 4. Disagreement with Bush v. Gore.
 
 
 61
 Canon 3 requires federal judges to "maintain professional competence in the law." Canon 3(A)(1). Although "incompetence" may not fit comfortably within the definition of "misconduct," it is arguably "conduct prejudicial to the effective and expeditious administration of the business of the court" or (less arguably) a "mental or physical disability" within the meaning of § 351(a). In any event, even assuming that demonstrated incompetence would constitute misconduct or a disability, we dismiss this claim as meritless. As shown by the closely divided vote in the Bush v. Gore decision itself, and the numerous analyses of that decision, reasonable people disagree over the soundness of the opinions in that case. See Bush v. Gore, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). Nothing in the Judge's comments about that decision raises an issue of competence.
 
 
 62
 C. The Yale Protest.
 
 
 63
 The complaint docketed under 04-8541 cites a report by the Associated Press that, on May 23, 2004, the Judge's wife attended a protest against the President and the war in Iraq, that she said that "she was protesting on behalf of herself and her husband" (identifying him by title, court and name), and that she expressed anger about the President's veracity and conduct of the war. The complainant argues that, by failing to "publicly correct[] his wife's comments that she was protesting on his behalf," the Judge "has allowed the impression to fester that he does take partisan political stands." As with the ACS remarks claims, this claim is construed as alleging a violation of Canon 7.
 
 
 64
 Both the Judge and his wife submitted letters in response. She had "no recollection of saying that [she] was protesting on behalf of [her] husband"; "[m]ore important, [the Judge] never authorized any such statement"; and she did not "believe that [she] would have said such a thing, as [she is] well aware of [the Judge's] obligation to avoid publicly opposing or endorsing candidates for public office, and [she is] vigilant against attribution of [her] own political views to [her] husband." Finally, she stated, as did the Judge in his response, that she was unaware of the allegation until it appeared in a June 25, 2004 newspaper story, over four weeks after the protest.
 
 
 65
 The Judge observes that his wife "is well aware of [his] obligation to avoid publicly opposing or endorsing candidates for public office, ... [he has] always counseled her that she must make every effort to avoid conveying the impression that she might be speaking on [his] behalf when expressing her political views," and "[o]ver the years she has been very faithful to that admonition." In any event, the Judge emphasizes that he "did not instruct or authorize her to make any statements on [his] behalf." Finally, the Judge states that he would have attempted to correct the article had he known of it at the time it was published (though he concedes no obligation to do so), but that he first became aware of the allegation approximately a month after the protest, by which time he felt that "it was too late to make a meaningful correction."
 
 
 66
 The dispositive question is whether the Judge authorized his wife to make the alleged comments. The only direct evidence bearing on that question indicates that he did not do so. Moreover, the Judge and his wife acknowledge that the Judge must avoid publicly endorsing or opposing political candidates, either directly or through his wife, and affirm their intention to abide by that rule.
 
 
 67
 As to whether the Judge should have corrected the Associated Press story once he became aware of it, we conclude that he had no ethical duty to do so. He became aware of the story approximately a month after it was published, and it would have been reasonable at that point to decide against reviving the story by correspondence to the editor.
 
 
 68
 The claim is dismissed for lack of evidence of misconduct.
 
 III. Conclusion
 
 69
 For the foregoing reasons, the Judicial Council finds that the Judge's remarks concerning the President's reelection violated Canon 7, concurs in Chief Judge Walker's July 24, 2004 admonition, concludes that the dissemination of Chief Judge Walker's admonition — together with the Judge's apology — and the Judicial Council's concurrence with the admonition, constitute both a sufficient sanction and corrective action, and dismisses the five complaints in all other respects.
 
 
 70
 So ordered.
 
 
 
 Notes:
 
 
 [1]
 The political views of many of the speakers listed for the various events described on the web site are not apparent. However, in addition to various speakers who are well known for being politically left-of-center, there are various speakers described as present or former officials in the current presidential administration, the Republican National Committee, and organizations such as the American Enterprise Institute and the National Right to Life Committee
 
 
 [2]
 To the extent that the complainants rely on the portion of Canon 7 which proscribes a judge from "mak[ing] speeches for a political organization," Canon 7(A)(2), that portion of the Canon does not apply since the Judge was not making his remarks "for" the ACS,i.e., he was not purporting to represent the organization or actively soliciting support for it.
 
 
 [3]
 Based on the ordinary meaning of those terms, and their use in the Senate and House ethics rules, "censure" and "reprimand" are deemed to be more serious sanctions than "admonishment."See Rules of Procedure of the Senate Select Committee on Ethics, 149 Cong. Rec. S2677-01 at * S2677, *S2683 (Feb. 25, 2003) (§ 2(a)(2)(B), found under "Part I: Organic Authority," and Rule 4(g), found under "Part II: Supplementary Procedural Rules")(listing as most serious sanctions for Senators: expulsion, censure, payment of restitution, and change in seniority or responsibilities; listing as less serious sanctions: reprimand or payment of restitution; listing a public or private letter of admonition as least serious sanction); Rules of the House Committee on Standards of Official Conduct, 108th Congress, 149 Cong. Rec. H2375-01 at *H2381 (Mar. 26, 2003)(Rule 24)(describing reprimand as "appropriate for serious violations," censure as "appropriate for more serious violations," and expulsion as "appropriate for the most serious violations"; a "letter of reproval" is apparently the least severe sanction). A public letter of admonition is quite obviously a more severe sanction than a letter that is private.