

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-2-2009

# IN RE: Complaint of Judicial Misconduct

Precedential or Non-Precedential: Precedential

Docket No. 08-9050

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

## Recommended Citation

"IN RE: Complaint of Judicial Misconduct " (2009). *2009 Decisions.* Paper 901.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/901

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

JUDICIAL COUNCIL OF THE THIRD CIRCUIT

_____

J.C. No. 03-08-90050

_____

IN RE:  COMPLAINT OF JUDICIAL MISCONDUCT

_____

ORIGINAL PROCEEDINGS UNDER 28 U.S.C. § 351

TRANSFERRED FROM JUDICIAL COUNCIL OF THE NINTH CIRCUIT
(J.C. No. 09-08-90035)

_____

MEMORANDUM OPINION

_____

(Filed: June 5, 2009)

Present:    SCIRICA, *Chief Judge*, SLOVITER, McKEE, RENDELL, BARRY, AMBRO,
AMBROSE, BROWN, BARTLE, KANE, and SLEET, *Members of the
Judicial Council*.

SCIRICA, *Chief Judge*.

A Complaint of judicial misconduct was identified under 28 U.S.C. § 351(b)

against Chief Judge Alex Kozinski[1] of the United States Court of Appeals for the Ninth

Circuit.  The identified Complaint was transferred by the Chief Justice of the United

States to the Judicial Council of the Third Circuit from the Judicial Council of the Ninth

Circuit.  This opinion sets forth the unanimous findings and conclusions of the Judicial

Council of the Third Circuit.

_____

[1]  The Judicial Council of the Third Circuit has determined that the name of the
Judge will be disclosed in this Memorandum Opinion.

The Judicial Conduct and Disability Act, 28 U.S.C. §§ 351–364, and the *Rules for Judicial-Conduct and Judicial-Disability Proceedings* govern this proceeding. All Rules cited in this Memorandum Opinion are the *Rules for Judicial-Conduct and Judicial-Disability Proceedings*.

I.

A.

**Jurisdiction and Procedural History**

On June 11, 2008, the *Los Angeles Times* published on its website an article entitled "9th Circuit's Chief Judge Posted Sexually Explicit Matter on His Website." The article reported, among other things, that the Judge, "who is currently presiding over an obscenity trial in Los Angeles, has maintained a publicly accessible website featuring sexually explicit photos and videos." In response to the article's publication, the Judge, who was sitting by designation as a district judge for the purpose of the obscenity trial, suspended the trial to permit exploration of a potential need for his recusal. The next day, the Judge issued a request that the Judicial Council of the Ninth Circuit initiate proceedings under Rule 26 with regard to allegations about him contained in the June 11, 2008, *Los Angeles Times* article.[2] The Judge then declared a mistrial in the obscenity trial

---

[2] The Judge's June 12, 2008, announcement stated in full: "I have asked the Judicial Council of the Ninth Circuit to take steps pursuant to Rule 26, of the Rules Governing Judicial Conduct and Disability, and to initiate proceedings concerning the article that appeared in yesterday's Los Angeles Times. I will cooperate fully in any investigation."

and recused himself from the case.

B.

**The Complaint and Transfer by the Chief Justice of the United States**

The Judicial Council of the Ninth Circuit construed the Judge's June 12, 2008, announcement as the identification of a complaint of judicial misconduct based on the allegations in the June 11, 2008, article. *See* 28 U.S.C. § 351(b); Rule 5. The Judicial Council of the Ninth Circuit asked the Chief Justice of the United States to transfer the identified Complaint to the judicial council of another circuit pursuant to Rule 26. On June 16, 2008, the Chief Justice granted the request and selected the Judicial Council of the Third Circuit to exercise jurisdiction over the Complaint. *See* Rule 26.

C.

**The Special Committee**

On June 20, 2008, the Honorable Anthony J. Scirica, Chief Judge of the United States Court of Appeals for the Third Circuit and Chair of the Judicial Council of the Third Circuit, entered an order appointing a Special Committee to investigate the Complaint against the Judge. *See* 28 U.S.C. § 353(a)(1); Rule 11(f). The members of the Special Committee were: Chief Judge Scirica, presiding; Marjorie O. Rendell, Circuit Judge, United States Court of Appeals for the Third Circuit; Walter K. Stapleton, Senior Circuit Judge, United States Court of Appeals for the Third Circuit; Garrett E. Brown, Jr., Chief Judge, United States District Court for the District of New Jersey; and Harvey

3

Bartle III, Chief Judge, United States District Court for the Eastern District of

Pennsylvania.[3]

II.

A.

**The Allegations**

In its June 16, 2008, order, the Judicial Council of the Ninth Circuit stated that the

"identified complaint" of misconduct against the Judge "is based on allegations in [the]

June 11, 2008, *Los Angeles Times* article."[4]  The primary focus of the June 11, 2008,

article was the *Los Angeles Times*'s assertion that the Judge "maintained a publicly

accessible website featuring sexually explicit photos and videos."  According to the

article, the "website" — http://alex.kozinski.com — included "a photo of naked women

on all fours painted to look like cows," "a video of a half-dressed man cavorting with a

sexually aroused farm animal," and "a graphic step-by-step pictorial in which a woman is

seen shaving her pubic hair."  Regarding the alleged public accessibility of the "website,"

the article reported that the Judge "said that he thought the site was for his private storage

and that he was not aware the images could be seen by the public, although he also said

---

[3] Chief Judge Scirica notified the Judge of the June 20, 2008, order appointing the Special Committee.  *See* 28 U.S.C. § 358(b)(1); Rule 11(g)(1).

[4] The June 16, 2008, order of the Judicial Council of the Ninth Circuit cited as the basis for the identified Complaint the article entitled "9th Circuit's Chief Judge Posted Sexually Explicit Matter on His Website," which appeared on latimes.com on June 11, 2008.  An expanded and revised version of the article appeared, under a different headline, in the *Los Angeles Times* print edition on June 12, 2008.

he had shared some material on the site with friends." The article noted that the Judge was presiding over the obscenity trial in *United States v. Isaacs* and questioned whether the material on the computer system "should force him to step aside" from the trial.

The *Los Angeles Times* apparently was alerted to certain material on the Judge's computer system by Cyrus Sanai, a Beverly Hills, California, attorney. Mr. Sanai contends that, in December 2007, he discovered certain material on the Judge's computer system. Mr. Sanai is a critic of the Judge and other Ninth Circuit judges against whom he has previously filed complaints of judicial misconduct in connection with litigation involving his family. Mr. Sanai has appeals pending before the United States Court of Appeals for the Ninth Circuit in *Sanai v. Sanai*, Nos. 07-36001 and 07-36002. Those appeals were pending in December 2007, when Mr. Sanai says he discovered the material.

B.

**Applicable Standards**

The Judicial Conduct and Disability Act defines judicial misconduct as "conduct prejudicial to the effective and expeditious administration of the business of the courts." 28 U.S.C. § 351(a). Under the *Rules for Judicial-Conduct and Judicial-Disability Proceedings*, judicial misconduct includes "conduct occurring outside the performance of official duties" which "might have a prejudicial effect on the administration of the business of the courts, including a substantial and widespread lowering of public

5

confidence in the courts among reasonable people." Rule 3(h)(2). These standards are informed, where appropriate, by the precepts of the Code of Conduct for United States Judges, which are "in many potential applications aspirational rather than a set of disciplinary rules." Commentary on Rule 3. Under the Code of Conduct, "[t]he test for appearance of impropriety is whether the conduct would create in reasonable minds, with knowledge of all the relevant circumstances that a reasonable inquiry would disclose, a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality, and competence is impaired." Code of Conduct for United States Judges, Commentary on Canon 2A.

## C.

### Focus of the Special Committee's Investigation

Proceeding from the allegations in the June 11, 2008, *Los Angeles Times* article, the Special Committee focused its factual investigation on four areas: (1) the creation, use, and maintenance of alex.kozinski.com; (2) the content of alex.kozinski.com; (3) the public accessibility of the material available at alex.kozinski.com; and (4) the circumstances of the Judge's assignment to the *Isaacs* obscenity trial.

With respect to the Judge's online computer files, the Special Committee gathered and reviewed information relevant to the following specific questions: (1) Who created, used, and maintained alex.kozinski.com? (2) When was alex.kozinski.com created, and for what purpose? (3) How was it used and maintained? (4) What material was available

6

on alex.kozinski.com? (5) Who placed it there? (6) How and when did that person (or those people) place it there? (7) What security measures, if any, were taken to prevent public access to alex.kozinski.com? (8) Who took such measures? (9) When were such measures taken? (10) Was the material on alex.kozinski.com shared? (11) If so, how and with whom was it shared? (12) Was it shared with the Judge's knowledge or permission? (13) What was the degree and manner of public accessibility to alex.kozinski.com? (14) What were the Judge's beliefs regarding public accessibility? and (15) What did the Judge know about attempts to access alex.kozinski.com?

D.

**Investigative Procedure**

The Special Committee, assisted by its counsel, Robert C. Heim of Dechert LLP and J. Gordon Cooney, Jr., of Morgan, Lewis & Bockius LLP, investigated these issues by making written and telephonic inquiries; reviewing relevant documents and the image, audio, and video files provided by the Judge; engaging a consultant to advise the Special Committee on certain computer technology issues; and examining the Judge in person, under oath, and on the record. The Judge cooperated fully in all aspects of the investigation. The Judge had the assistance of counsel, Mark C. Holscher of Kirkland & Ellis LLP, throughout the investigation.

Counsel for the Special Committee sent a letter to Mr. Holscher requesting documents and other information. The Judge responded through a detailed letter from

7

Mr. Holscher and a voluminous appendix containing technical information, charts listing the contents of alex.kozinski.com, a disc containing the image, audio, and video files downloaded by the *Los Angeles Times* from the subdirectory that contained the material referenced in the June 11, 2008, article, and other requested material.

After reviewing the Judge's submission, counsel for the Special Committee identified several follow-up questions in a letter to Mr. Holscher and in several telephone conferences. Mr. Holscher responded with written answers to these questions; no requests were refused.

In order to assist with technical issues in this matter, the Special Committee retained an information technology consultant, who reviewed relevant documents and assisted counsel for the Special Committee in confirming certain technical information. The Special Committee also consulted with the Deputy Circuit Executive for Information Technology for the United States Court of Appeals for the Third Circuit.

The Special Committee requested information in the form of an affidavit from Cyrus Sanai, the attorney who claimed to have alerted the *Los Angeles Times* to the content and accessibility of alex.kozinski.com. Mr. Sanai responded to the Special Committee's request with a brief sworn affidavit and a lengthy attached "Statement of Facts" covering a variety of topics, including several outside the scope of the identified Complaint.

Mr. Holscher provided to counsel for the Special Committee a legal ethics opinion

8

letter from a law professor contending the Judge engaged in no misconduct. Mr. Holscher later submitted four additional ethics opinion letters from law professors, also contending the Judge engaged in no misconduct, along with a letter brief that drew upon the expert opinions.

After a series of exchanges, counsel for the Special Committee and the Judge's counsel agreed upon twenty-eight factual stipulations relating to the technical matters at issue in the investigation. The technical stipulations were reviewed and verified by the Special Committee's technical consultant prior to counsel's executing the stipulation.

The members of the Special Committee and its counsel thoroughly reviewed the information provided by the Judge, including the computer files comprising the material described in the June 11, 2008, *Los Angeles Times* article.

The members of the Special Committee and the Judge, accompanied by their respective counsel, convened in Philadelphia for a hearing. For nearly three hours, the Judge testified under oath and on the record about facts relating to the investigation. The hearing began with an opening statement by the Judge, was followed by questioning from counsel for the Special Committee, and was concluded with questions by the members of the Special Committee. The members of the Special Committee found the Judge to be credible and thoroughly responsive to all the questions posed by counsel and the Special Committee.

On April 29, 2009, the Special Committee filed its Report with the Judicial

Council of the Third Circuit.[5]

E.

**Overview**

In June 2008, a public controversy followed the publication of a *Los Angeles Times* article that alleged the Judge had maintained a publicly accessible website featuring sexually explicit photographs and videos. The Judge requested this investigation into his personal conduct.

Some media reports in June 2008 suggested that the Judge maintained, and intended to maintain, a public website, as that term is commonly understood — a presentation of offensive sexually explicit material open for public browsing. This investigation has established, however, that such a characterization is incorrect. As explained in further detail, the computer files described in media reports in June 2008 constituted a small fraction of a vast aggregation of various items that the Judge had received by e-mail over many years and had retained in a folder, or "subdirectory," on a personal computer in his home, which had been connected to the Internet using web server software.

Through a combination of improper security configuration and carelessness on the part of the Judge, the aggregation of retained files became accessible to the public.

---

[5] The Judge was notified of the filing of the Special Committee's Report and received a copy of the Report. *See* Rule 15(b). The Judge, through counsel, submitted a response letter to the Judicial Council. *See* Rule 20(a).

Uninvited visitors to the web server who knew the name of the specific subdirectory on the Judge's computer could access the files, including the sexually explicit material. At least one Internet search engine catalogued the contents of the subdirectory containing the sexually explicit material, with the consequence that Internet searchers could locate the material. The Judge eventually became aware that members of the public could access the files, although he did not know about the search-engine cataloguing. Despite some small steps to remove offensive material from potential public view, the Judge neglected to complete this task or to disconnect the computer from the Internet. The consequence of the Judge's possession of sexually explicit offensive material combined with his carelessness in failing to safeguard his sphere of privacy was the public controversy in June 2008.

In testimony under oath before the Special Committee, the Judge explained his habit of saving the files, characterized the aggregation of files as including some offensive and demeaning material, promised to delete the sexually explicit files, and apologized for allowing his personal conduct to embarrass the federal judiciary.

This opinion, which will be made public according to the *Rules for Judicial-Conduct and Judicial-Disability Proceedings*, concludes the investigation in the following manner. We find that the Judge's possession of sexually explicit offensive material combined with his carelessness in failing to safeguard his sphere of privacy was judicially imprudent. Moreover, once the Judge became aware in 2007 that offensive

11

material could be accessed by members of the public, his inattention to the need for prompt corrective action amounted to a disregard of a serious risk of public embarrassment. We join with the Special Committee in admonishing the Judge that his conduct exhibiting poor judgment with respect to this material created a public controversy that can reasonably be seen as having resulted in embarrassment to the institution of the federal judiciary. We determine that the Judge's acknowledgment of responsibility together with other corrective action, his apology, and our admonishment, combined with the public dissemination of this opinion, properly conclude this proceeding.

Below are the findings of the Judicial Council of the Third Circuit, after having received the recommendations of the Special Committee, with respect to the allegation that the Judge maintained a publicly accessible website featuring sexually explicit offensive material. We set forth the Judge's conduct subsequent to the publication of the *Los Angeles Times* article, including testimony before the Special Committee. Guided by applicable standards of judicial conduct and procedural rules, we evaluate the entirety of the Judge's described conduct. We then explain our conclusions and action with respect to the identified Complaint. We also present our findings and conclusions with respect to the Judge's assignment to and recusal from the *United States v. Isaacs* trial.

12

III.

**The Online Computer Files**

**Early Computer Use**

The Judge has used computers for over two decades and has collected thousands of personal files during that time. Since 2002, many of those files have been stored in a directory named *alex* on a personal computer system in the Judge's home. The electronic files at issue in the identified Complaint were stored on the Judge's personal computer system in his home, not on any computer or system provided by the federal government for his official use. The image and video files discussed in the June 11, 2008, *Los Angeles Times* article were stored in a subdirectory of the *alex* directory called *stuff*. The *alex* directory — which contained twenty-seven other subdirectories in addition to *stuff* — contained over 13,000 files, including almost 7,000 family photographs.

The *stuff* subdirectory contained what the Judge called a "large agglomeration of files" — close to 600 — that he had "collected over many years," the vast majority of which were not of a sexually explicit nature. The Judge's activity can best be described as saving or retaining the files. His habit with respect to the *stuff* subdirectory was to keep a wide variety of items he had received by e-mail, among which were television commercials, video clips from television shows and other sources, publicly available court filings and other written materials, cartoons, animated videos and games, song parodies, and photographs of other subjects. Some of the material was sexually

13

suggestive; a portion of that material was sexually explicit.

Before the *alex* directory was connected to the Internet, it was located on a separate server that was connected to the Judge's personal home computer. The original purpose of the server was to back up data on the Kozinski family computer hard drive. The *alex* directory, and a large portion of the files in it, existed long before the directory could be accessed remotely via the Internet.

The Judge has little memory of the specific source of most of the files in the *stuff* subdirectory. The Judge testified that sometime around 1995 he started retaining material he received by e-mail from friends and acquaintances. The Judge testified that he could not recall ever downloading the *stuff* material from websites. The Judge testified that he does not visit and has no interest in pornographic websites.

According to the Judge, when some of the *stuff* material initially was received, his personal computer was connected to the Internet via a slow-operating modem, so he often moved e-mail attachments he received into the *stuff* subdirectory without even opening them, with the thought of opening them later when he had more time. The Judge testified that the files were "like old things that I've sort of thrown into a room without thinking about them." He explained:

> People send me e-mail attachments all the time. I'm sure I'm not unique in that regard. Some of them I find funny and interesting, others I discard immediately. Then there are some that I don't have time to open right there and then. This was especially true in — several years ago, when I had a modem connection, and downloading an e-mail attachment would take many long minutes, sometimes half an hour or an hour. Sometimes I

14

did go back and look at the files and left them on the *stuff* folder without ever thinking about them again.

Now, I do want to make it clear that I do remember some of the sexually explicit files. And, frankly, I don't know why I kept them. Some I thought were odd or funny or bizarre, but mostly I don't have a very good reason for holding onto them. I certainly did not send them to anyone else or ask anyone to send me similar files.

I did not appreciate, when I put the server online, that the files could potentially be accessed by others and myself, or the consequences of having my name associated with those files. Had I been aware, I would never have saved them.

### Connection of the Family Server to the Internet

In 2002, the Kozinski family decided to connect the family server to the Internet as a convenient means to access personal files while away from home. Through the use of web server software, the Judge could access the files and subdirectories in the *alex* directory using a web browser via the Internet at http://alex.kozinski.com.[6] This access was enabled by Apache server software.

The Judge's adult son, a computer hobbyist, configured the web server and operated and maintained it over several years; an outside computer expert was never consulted. Notwithstanding his son's involvement, the Judge acknowledged his own ability to remove any of the files in the *alex* directory, including those in the *stuff*

---

[6] http://alex.kozinski.com was the Internet location, or uniform resource locator (URL), of the *alex* directory. Subdirectories of the *alex* directory could be located by adding an extension to the end of the *alex* directory's URL. For example, the *stuff* subdirectory was accessible at http://alex.kozinski.com/stuff.

subdirectory, and he accepts full responsibility for its contents.

After the Judge's son built the server in 2002, the contents of the *alex* directory and the *stuff* subdirectory were moved onto alex.kozinski.com without any particularized review. Consequently, material that was not originally intended for storage on the Internet became accessible online at this time.

alex.kozinski.com was not set up as a public website as that term is commonly understood; there was no home page, no links, and none of the common indicia of a website. alex.kozinski.com was a collection of files and subdirectories that was created so the Judge and his family and certain close friends could access them remotely using a web browser. The Judge never promoted alex.kozinski.com as a public website. Initially he had no reason to believe that the public knew of its existence. He also never intended to grant permission to the general public to access his family's server. The Judge testified, "We intended no visitors. We wanted no visitors. It was not something that was meant to be in any way like a web site."

### Sharing Material via alex.kozinski.com

Although the Judge did not intend to provide uninvited public access to alex.kozinski.com, he did use it to share links to personal photographs with family and "a very close circle of friends" (numbering about two dozen) — all "people [he] knew very well" — or to share links to legal writings with fellow judges from around the world. Also, on certain occasions when he taught or lectured at law schools, the Judge set up

16

subdirectories within the *alex* directory as a convenient way to provide educational material to his students. Except for these discrete purposes, the Judge testified he did not recall giving out links to or the names of his server directory or subdirectories. With one notable exception (discussed below), other than on very rare occasions where he sent material to a close friend, the Judge testified that he could not recall sending out links to files in the *stuff* subdirectory, nor did he invite people to access the server to look at sexually explicit material. He testified that he "certainly did not send" sexually explicit files to anyone.[7]

### Initial Security Settings for alex.kozinski.com

No username or password was required to access alex.kozinski.com and/or to view a list of the files and directories on the Kozinski family server. The Judge testified that when the server was first connected to the Internet in 2002, he "did not give any thought to security" because he considered alex.kozinski.com to be "just a private — a way of privately accessing [his] files." The Judge relied on not distributing the name of alex.kozinski.com and its subdirectories other than to family or close friends — a method known as "security through obscurity" — as a means of protecting against uninvited public access to that material.

_____

[7] The Judge did not intentionally distribute music files located in his *stuff* subdirectory, and did not believe or understand that any of these files were being accessed by file sharing websites. The Judge testified that he did not share by e-mail any music files in the *stuff* subdirectory.

17

**Transmission of jump.avi Link to *Underneath Their Robes***

In 2004, the Judge sent a link to a video of himself bungee jumping as part of a tongue-in-cheek message for posting on *Underneath Their Robes*, a blog about the federal judiciary. The video was located in the *stuff* subdirectory, and the link sent by the Judge had the URL http://alex.kozinski.com/stuff/jump.avi. This video did not contain any sexually explicit or otherwise controversial material. *Underneath Their Robes* posted the link to the jump.avi video using the URL to the *stuff* subdirectory that the Judge had provided. The Judge did not expect the blog to post a direct link to the jump.avi file in his *stuff* subdirectory; he thought the blog would instead download a copy of the video and post the video rather than the link. Internet users who visited the page of the *Underneath Their Robes* blog containing the posting about the Judge and clicked on the jump.avi link, or examined the HTML code for that page of the blog, could see the URL http://alex.kozinski.com/stuff/jump.avi. The posted link therefore revealed the URL for the jump.avi file as well as the name of the *stuff* subdirectory, compromising its "security through obscurity." Accordingly, any person who viewed the relevant page of the *Underneath Their Robes* blog could learn of the existence of the *stuff* subdirectory and could gain access to it and its files by typing the URL http://alex.kozinski.com/stuff into a web browser.

The Judge was not aware at the time that the public could gain access to his subdirectories in this manner. When he provided the jump.avi link to *Underneath Their*

*Robes*, the Judge did not intend to provide public access to the *stuff* subdirectory. Additionally, when he provided the jump.avi link to *Underneath Their Robes*, the Judge was unaware that Yahoo! could locate and index the contents of the *stuff* subdirectory if an e-mail recipient with Yahoo! Toolbar software installed clicked on the jump.avi link that appeared on *Underneath Their Robes*.

**Awareness of, and Response to, Security Issues in 2005**

The Judge first became aware of security issues with alex.kozinski.com in early 2005, when a friend sent him an e-mail commenting on files from the server other than the ones the Judge had intended to share with him. As a result, the Judge knew as of that time that people with whom he had shared links to files on alex.kozinski.com may have been able to access files on alex.kozinski.com other than the files he had intended to share with those people. The Judge testified that he did not know at this time that strangers — people with whom he had not intended to share any files — might be able to access files on alex.kozinski.com.

In response to this information, the Judge instructed his son to temporarily disconnect the web server from the Internet and to take measures to restrict access before reconnecting the web server to the Internet. After the Judge's son researched the issue, the Judge and his son installed an index.html file in the *alex* directory to hide the names of the server subdirectories within it. The existence of an index.html file in any directory accessible via the web server masks the names of files and subdirectories located in that

directory. As a result of the installation of the index.html file in the *alex* directory, any access from the Internet to the URL http://alex.kozinski.com led to an HTML page that neither contained any links to nor advertised the existence of any files or subdirectories on the Kozinski family server. There was nothing on alex.kozinski.com that advertised or otherwise made public the existence of *stuff* or other hidden subdirectories or their contents. When they installed the index.html file, the Judge and his son incorporated a message on alex.kozinski.com that read: "Ain't nothing here. Y'all best be moving on, Compadre." An Internet user who typed alex.kozinski.com into a web browser would have seen this message. The Judge believed that these "discouraging words" notified outsiders attempting to access his server that they were to "keep out of here" and that they were "not welcome."

The Judge believed at the time that the existence of the index.html file would thwart any uninvited access to the subdirectories on his server. Contrary to the Judge's expressed belief, however, a person could still access the contents of *alex* subdirectories from the Internet — despite the placement of the index.html file — if he or she knew the name of a specific subdirectory. In other words, the installation of the index.html file served only to block the *listing* of subdirectories on alex.kozinski.com and did not restrict *access* to the subdirectories. Accordingly, the contents of the subdirectories were not masked as the Judge had thought. The Judge testified that he and his son did not install an index.html file in each of the subdirectories because the Judge mistakenly believed that

20

it was not necessary. Instead, they installed only one index.html file in the *alex* directory.

## Knowledge of, and Protection Against, Internet Spiders

The Judge belongs to an international discussion group for judges. In late 2005, the group's website crashed and the Judge offered to host the group's replacement webpage temporarily on his home server in a separate subdirectory created for that purpose. One of the judges in the group suggested to the Judge that he should have some protection against "spiders" and "crawlers," *i.e.*, sophisticated automated web-scanning software, such as that employed by Yahoo! Toolbar, that aggressively catalogues and indexes website content and makes it available to the public via web searches.

This was the first time the Judge had heard about spiders or crawlers, and he asked his son what could be done to protect his server against them. His son suggested installing a robots.txt file. The Judge believed that installing the robots.txt file would protect his entire server from access by spiders and indexing by search engines. But due to a miscommunication or configuration error, when the Judge's son installed the robots.txt file, he installed it only in the subdirectory created for the group of judges. The result was that only that particular subdirectory was protected against spiders; the rest of the *alex* directory was not.

The Judge became aware of the limited scope and effect of the robots.txt file only after the publication of the June 11, 2008, *Los Angeles Times* article. The Judge testified that he thought the robots.txt file "was there, it was guarding the door. And if I had

21

known that crawlers or search engines were indexing my files, I would have just taken it offline immediately.  I had no idea."

**Awareness of, and Response to, Security Issues in 2007**

At some point before December 2007, files in the Judge's *stuff* subdirectory were indexed by Yahoo! and may have also been available through other Internet search engines.  The Yahoo! spiders may have located the link to http://alex.kozinski.com/stuff/jump.avi in the HTML code of the *Underneath Their Robes* blog, dissected that link, and scanned and indexed the contents of http://alex.kozinski.com/stuff.  The other likely way that the *stuff* subdirectory was indexed by Yahoo! is through a feature of the Yahoo! Toolbar.  Certain versions of the Yahoo! Toolbar transmit all URLs visited from a computer to Yahoo! for indexing by spiders.  Thus, if the Judge sent a link to a file in any of his subdirectories to a friend, family member, associate, or anyone else with a computer running Yahoo! Toolbar software, the simple act of clicking on the link could have resulted in Yahoo! obtaining an index of all of the files in the subdirectory.

Once the *stuff* subdirectory was indexed by Yahoo!, the files in that subdirectory could be located by Internet users who used Yahoo! to search the web.  By late 2007, an Internet user who searched for alex.kozinski.com on Yahoo! would receive, among other things, a listing of files in the *stuff* subdirectory.

In late 2007, the Judge became aware that, despite the precautionary measures he

and his son had taken, it was still possible for uninvited persons to access and browse the hidden subdirectories if their titles were known. Specifically, the Judge realized that people who had a link to one of his subdirectory files might be able to use it to access other files on the server. He knew this, in part, because a cousin wrote to him sometime in Fall 2007 to congratulate him on family photographs in the Judge's *photos* subdirectory that were different from the pictures that the Judge had sent him. The Judge then tested the public accessibility of alex.kozinski.com from a computer outside his home, and discovered that in fact his server could still be accessed by uninvited persons.

Having made this discovery, the Judge began to open and examine files in the *stuff* subdirectory to remove those that he thought might be deemed offensive. Specifically, he moved three sexually explicit files that he could recall being in the *stuff* subdirectory, to a separate, hidden folder.[8] The Judge did not continue removing problematic files from his *stuff* subdirectory. He admitted that he did not do so because going through the many files in the *stuff* subdirectory to locate sexually explicit and offensive material was, according to the Judge, time-consuming, difficult, and tedious since many of the file titles were uninformative and there were so many files to review in the subdirectory. He also noted that he was very busy at the time because he was preparing to start his term as Chief Judge of the United States Court of Appeals for the Ninth Circuit. The Judge had not

---

[8] In response to a question at the hearing, the Judge testified that he was moving the files into a separate hidden folder for later deletion — specifically, permanent and unrecoverable deletion — which he believed his son knew how to perform.

completed the sorting process when the *Los Angeles Times* visited his server in 2008.

When the *Los Angeles Times* posted the June 11, 2008, article, the Judge disabled public access to alex.kozinski.com, the *alex* directory, and all subdirectories, including *stuff*, by disconnecting the server from the Internet.

The Judge testified that he regrets not finishing the task of removing problematic files from the *stuff* subdirectory and admits that he should have finished it or at least taken the server offline until that task was completed. While the Judge understood it was possible that individuals might stumble upon alex.kozinski.com, he admitted that he "fell down on the job" and "didn't try nearly hard enough."

The Judge also made clear that had he completed the task of reviewing the files, he would have gotten "rid of [the] salacious files" because he "didn't want to keep them." The Judge explained that he is "sorry [he] ever kept" the sexually explicit files and is "anxious to get rid of them," but has not done so on the advice of his counsel, to prevent any concern about spoliation of evidence.

IV.

The Judicial Conduct and Disability Act allows any person to file a complaint alleging judicial misconduct against a federal judge. The Act was designed "to establish a procedure for the processing of complaints directed against federal judges." S. Rep.

No. 96-362, at 1 (1979), *as reprinted in* 1980 U.S.C.C.A.N. 4315, 4315.[9]  Here, as noted,

the Judge initiated this disciplinary proceeding himself by requesting that the *Los Angeles*

*Times* article be treated as a complaint of judicial misconduct.

The Judicial Conduct and Disability Act defines judicial misconduct as "conduct

prejudicial to the effective and expeditious administration of the business of the courts."

28 U.S.C. § 351(a).  In 2008, the Judicial Conference of the United States promulgated

the *Rules for Judicial-Conduct and Judicial-Disability Proceedings* in order to "guid[e]

the various officers and bodies who must exercise responsibility under the Act."

Commentary on Rule 1.  Rule 3 further defines judicial misconduct.  It first provides a

litany of specific conduct that qualifies as "misconduct."  *See* Rule 3(h)(1)(A)–(G).

Cognizable misconduct may involve a judge's official duties, *see* Rule 3(h)(1), or, in

some circumstances, conduct occurring outside the performance of official duties, *see*

Rule 3(h)(2).

Under the Judicial Conduct and Disability Act and the Rules, actions available to

the Judicial Council upon receipt of the report of a Special Committee include the

following:

> ordering that, on a temporary basis for a time certain, no further cases be assigned
> to the judge whose conduct is the subject of a complaint;
>
> censuring or reprimanding such judge by means of private communication;

---

[9] The Act was amended by the Judicial Improvements Act of 2002, as codified at
28 U.S.C. §§ 351–364.

censuring or reprimanding such judge by means of public announcement;

certifying disability of the judge pursuant to the procedures and standards provided under [28 U.S.C. § 372(b)];

requesting that the judge voluntarily retire, with the provision that the length of service requirements under [28 U.S.C. § 371] shall not apply;

refer[ring] any complaint . . ., together with the record of any associated proceedings and its recommendations for appropriate action, to the Judicial Conference of the United States;

[i]n any case in which the judicial council determines, on the basis of a complaint and an investigation under this chapter, or on the basis of information otherwise available to the judicial council, that a judge appointed to hold office during good behavior may have engaged in conduct —

> (A) which might constitute one or more grounds for impeachment under article II of the Constitution, or
>
> (B) which, in the interest of justice, is not amenable to resolution by the judicial council,

. . . promptly certify[ing] such determination, together with any complaint and a record of any associated proceedings, to the Judicial Conference of the United States.

*See* 28 U.S.C. §§ 354(a)–(b).  The Judicial Council also may dismiss the complaint, *see* Rule 20(b)(1)(A), or it may "conclude the proceeding because appropriate corrective action has been taken or intervening events have made the proceeding unnecessary," Rule 20(b)(1)(B).

The allegation that the Judge maintained a publicly accessible website involves conduct outside the performance of judicial duties.  Cognizable misconduct nevertheless includes "conduct occurring outside the performance of official duties" which "might

26

have a prejudicial effect on the administration of the business of the courts, including a substantial and widespread lowering of public confidence in the courts among reasonable people." Rule 3(h)(2). This provides the starting point for our analysis.

A.

Some of the content of the *stuff* subdirectory — the sexually explicit material — is undoubtedly offensive to many. The identified conduct at the core of this Complaint consists of the possession of sexually explicit offensive material combined with its public accessibility. No provision of the Act, the Rules, or the Canons specifically addresses the propriety of such conduct by a judge. These facts distinguish this matter from other complaints of misconduct; see, for example, *In re Charges of Judicial Misconduct*, 404 F.3d 688 (2d Cir. Judicial Council 2005). Judicial misconduct is not limited to violations of the law, as the Act and Rules make clear, but may occur whenever a judge engages in "conduct prejudicial to the effective and expeditious administration of the business of the courts." 28 U.S.C. § 351(a); Rule 3(h)(1). As noted, the Rules specify that "conduct occurring outside the performance of official duties" may constitute misconduct if "the conduct might have a prejudicial effect on the administration of the business of the courts, including a substantial and widespread lowering of public confidence in the courts among reasonable people." Rule 3(h)(2).

A judge's conduct may be judicially imprudent, even if it is legally defensible. The aspirational goals of the Canons in the Code of Conduct for United States Judges

27

counsel judges to avoid allowing their personal or professional conduct to cause public embarrassment to the judiciary. Canon 2(A) provides that "[a] judge . . . should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." The Commentary on Canon 2(A) explains:

> Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. A judge must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly. The prohibition against behaving with impropriety or the appearance of impropriety applies to both the professional and personal conduct of a judge.

The Code of Conduct "is in many potential applications aspirational rather than a set of disciplinary rules." Commentary on Rule 3. Accordingly, a violation of a Canon does not necessarily amount to judicial misconduct. *See* Commentary on Canon 1 ("Many of the proscriptions in the Code are necessarily cast in general terms, and it is not suggested that disciplinary action is appropriate where reasonable judges might be uncertain as to whether or not the conduct is proscribed.").

A 2006 report on the implementation of the Judicial Conduct and Disability Act, commissioned by Chief Justice William H. Rehnquist and known as the *Breyer Committee Report*,[10] addressed a whole range of matters, and reflects some of the tensions

---

[10] The committee, chaired by Justice Stephen G. Breyer, was charged with assessing how the judicial branch has administered the Judicial Conduct and Disability Act and what steps could be taken to handle and investigate misconduct complaints more effectively. *See* The Judicial Conduct and Disability Act Study Committee,

implicated here. The *Report* noted that "the fact that a judge's alleged conduct occurred off the bench and had nothing to do with the performance of official duties, absolutely does not mean that the allegation cannot meet the statutory standard" for judicial misconduct. *Breyer Committee Report* at 147. Having acknowledged that misconduct may encompass lawful extra-judicial behavior, the *Report* also recognized a legitimate zone of privacy for judges:

> [M]any might argue that judges are entitled to some zone of privacy in extra-official activities into which their colleagues ought not venture. Perhaps the statutory standard of misconduct could be construed in an appropriate case to have such a concept implicitly built-in.

*Id.* Recognizing the complexity and sensitivity that accompanies the evaluation of the extra-judicial conduct of judges, the *Report* acknowledged that any bright-line rule governing such conduct would be unsuitable; instead, as the *Report* implicitly acknowledged, extra-judicial conduct must be evaluated by chief judges, special committees, and judicial councils under the facts and circumstances of individual complaints. The necessity for consideration of individual facts and circumstances is specifically contemplated by the Rules. *See, e.g.*, Commentary on Rule 3 ("Ultimately, the responsibility for determining what constitutes misconduct under the statute is the province of the judicial council of the circuit . . . ."); *see also* Code of Conduct for United States Judges, Commentary on Canon 1 ("Whether disciplinary action is appropriate, and

---

*Implementation of the Judicial Conduct and Disability Act of 1980: A Report to the Chief Justice* (2006) [hereinafter *Breyer Committee Report*].

29

the degree of discipline to be imposed, should be determined through a reasonable application of the text and should depend on such factors as the seriousness of the violation, the intent of the judge, whether there is a pattern of improper activity, and the effect of the improper activity on others or on the judicial system.").

B.

Against this background, we base our findings on the record of the Special Committee's investigation. Some public reports have suggested that the Judge presented, or intended to present, the material in his *stuff* subdirectory as a website open to public browsing. This is incorrect; the record refutes any such characterizations. The material in the *stuff* subdirectory was plainly intended to be private and not to be presented as a public website.

But possession of controversial private material such as that at issue here carries with it the peril of unwanted disclosure. As noted, the conduct at issue here extends beyond the purely private possession of controversial material. The Judge became aware over time that, despite his initial intent, members of the public could access material in his *stuff* subdirectory because of the Internet accessibility of the subdirectory.

The Judge learned in 2005 that personal files on his family's server that he did not intend to share could be accessed through the Internet by uninvited persons. Although he took some measures to secure his personal files, the measures were, he admits, inadequate. Moreover, in late 2007, when he learned of continued uninvited access to his

30

personal files, the Judge could have completed the job of securing his server and/or removing or making his personal files private. And, although he began the process of moving some files to a secure directory in order to delete them at a later time, he left most of the files in the *stuff* subdirectory untouched and unprotected.

The identified conduct at issue in this Complaint is the possession of sexually explicit offensive material combined with its public accessibility. The question is how to evaluate this conduct under the standards set forth in the Act and the Rules.

## C.

Like any citizen, a judge enjoys a sphere of privacy. As noted, however, a judge's conduct may be legally defensible but judicially imprudent. Imprudent extra-judicial conduct that becomes public may result in gratuitously offending many people and invite public controversy, which in turn may undermine public confidence in the judiciary.[11] The Judge's possession of sexually explicit offensive material combined with his carelessness in failing to safeguard his sphere of privacy was judicially imprudent. Moreover, once the Judge became aware in 2007 that offensive material could be

---

[11] *See* Code of Conduct for United States Judges, Canon 2A; Commentary on Canon 2A ("A judge must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly. . . . The test for appearance of impropriety is whether the conduct would create in reasonable minds, with knowledge of all the relevant circumstances that a reasonable inquiry would disclose, a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality, and competence is impaired.").

accessed by members of the public, his inattention to the need for prompt corrective action amounted to a disregard of a serious risk of public embarrassment. The Judge in his acceptance of responsibility and his apology has acknowledged as much. We join with the Special Committee in admonishing the Judge that his conduct exhibiting poor judgment with respect to this material created a public controversy that can reasonably be seen as having resulted in embarrassment to the institution of the federal judiciary.

D.

In his testimony before the Special Committee, the Judge accepted responsibility for the events that culminated in the June 11, 2008, *Los Angeles Times* article. He apologized for possessing the offensive material and for failing to secure it after his personal files were placed online and when he knew it was possible for uninvited persons to find them. The Judge testified:

> I have caused embarrassment to the federal judiciary. I put myself in a position where my private conduct became the subject of public controversy. While this was painful for me personally, my greatest regret is that I was identified as a federal judge, indeed, as a Chief Judge of the nation's largest federal circuit. And thus whatever shame was cast on me personally, it reflected on my colleagues and our system of justice as well.
> * * *
> My unfortunate carelessness with certain files on my computer has embarrassed the federal courts. And for this, I am deeply sorry.

With regard to the content of the *stuff* subdirectory described in the *Los Angeles Times* article, the Judge characterized it as including some material that was "highly offensive," "gross," "demeaning" and with "no redeeming value." The Judge recognizes

that some members of the public, upon learning he possessed the material, may have the misimpression that he has demeaning or disdainful attitudes toward women, creating in the minds of some people what he called "a highly distorted picture" of him. The Judge testified, "It is especially unfortunate that this happened on account of images and videos that I care absolutely nothing about." The Judge explained:

> [B]y the fall of 2007, I did come to understand that people who had a link to one of the files on my server could use it to access other files on the server. I was aware that some of the files that could be accessed in this manner would be highly offensive and demeaning to many people. It has never been my intention to offend or demean anyone. I have now looked at the files in question and fully agree that many would rightfully find them offensive and demeaning. Indeed, I find some of them offensive and demeaning, and I'm anxious to get rid of them. I'm anxious to delete them.

He added that "once you give me the go ahead, I plan to get rid of those things."

With regard to his failure to adequately secure his server from uninvited access, the Judge testified:

> I recognize I should have been aware of the danger, and I should either have taken my server offline or worked diligently to remove the files that were sexually explicit and offensive. I was careless in that regard. And for that, I am very sorry and offer my sincere apology.

The Judge explained:

> Had I known how easily the files could be accessed by strangers, or that the files on my server had been indexed by Yahoo! and perhaps other search engines, I would have been much more diligent. But I failed to take it as seriously as I should have, because at the time, I incorrectly viewed this as only a threat to my privacy, rather than something presenting the risk of public exposure.

He further stated: "I should have done it. I wish I had done it. I started to do it, and I fell

33

down on the job." "[O]nce I realized — I knew there was a problem, I should have taken the server offline and not let it be there until I had cleaned it up."

The Judge testified that before bringing the server back online, he will "implement password control security for all of [his] private files."

## E.

In summary, in response to the June 11, 2008, *Los Angeles Times* article and the public controversy that followed, the Judge: (1) took the web server offline so that his personal files could not be accessed by anyone, (2) initiated this disciplinary proceeding himself and cooperated fully in our investigation, (3) explained how and why his personal files were not protected from public view, (4) apologized for the offensive and demeaning character of some of his personal files and promised to delete permanently the sexually explicit material, (5) acknowledged the embarrassment his conduct has caused the judiciary, (6) promised to install password protection to secure his personal files in the future, and (7) acknowledged that judges have an obligation to ensure that their private matters do not become grist for the public mill.

## F.

The question remains, then: what, if any, further action is appropriate? The Judge explained and admitted his error; apologized for it, recognizing its impact on the judiciary; and committed to changing his conduct to avoid any recurrence of the error. The offending material has been removed and will be destroyed. The Judge's

acknowledgment of responsibility combined with the corrective actions he has already completed or has committed to pursue and his apology, along with our admonishment, made public in this opinion, properly "remed[y] the problems raised by the complaint." Rule 11(d)(2). Accordingly, this proceeding is properly concluded. We find that "all of the purposes of the judicial misconduct provisions are fully served" by this result. *In re Charges of Judicial Misconduct*, 404 F.3d 688, 697 (2d Cir. Judicial Council 2005).

We take this action in accordance with Rule 20(b)(1)(B), which permits the Judicial Council to "conclude the proceeding because appropriate corrective action has been taken or intervening events have made the proceeding unnecessary." Under Rule 11(d)(2), "appropriate" corrective action is sufficient to terminate and conclude the matter if it is "voluntary" and "acknowledges and remedies the problems raised by the complaint."

The Commentary on Rule 11(d) explains that resolving a complaint based on corrective action is the preferred course in a proceeding such as this:

> Because the Act deals with the conduct of judges, the emphasis is on correction of the judicial conduct that was the subject of the complaint. Terminating a complaint based on corrective action is premised on the implicit understanding that voluntary self-correction or redress of misconduct or a disability is preferable to sanctions.

Commentary on Rule 11 (citation omitted) (citing *Breyer Committee Report* at 149–50); *see, e.g., In re Charges of Judicial Misconduct*, 404 F.3d at 698 (explaining that no additional action by the Judicial Council was necessary because the subject judge

35

acknowledged that making the public remarks at issue was a mistake and apologized for the remarks).[12]

## V.

### *United States v. Isaacs*

#### A.

On June 11, 2008, the date of publication of the *Los Angeles Times* article, the Judge was presiding over a criminal obscenity trial, *United States v. Isaacs*. The Judge was sitting by designation as a district judge for the purpose of the trial.

On the day of the article's publication, the Judge suspended the trial to permit exploration of a potential need for his recusal. On June 13, 2008, the Judge declared a mistrial and recused himself from the case. The case was returned to the original district judge, and the defendant, Ira Isaacs, immediately sought dismissal on double jeopardy grounds. The District Court denied Isaacs's motion to dismiss the indictment with prejudice, and Isaacs filed an interlocutory appeal in the United States Court of Appeals for the Ninth Circuit. That appeal is pending.

---

[12] The Judicial Conduct and Disability Act is "remedial legislation, designed primarily to correct aberrant behavior, not to punish judges." *See* Jeffrey N. Barr & Thomas E. Willging, *Decentralized Self-Regulation, Accountability, and Judicial Independence Under the Federal Judicial Conduct and Disability Act of 1980*, 142 U. Pa. L. Rev. 25, 93 (1993). *See* Richard L. Marcus, *Who Should Discipline Federal Judges, and How?*, 149 F.R.D. 375, 385–86 (1993) ("[T]he objective of the Act was to improve judicial performance. Thus it is not surprising that complaints under the Act seem to have had a more wide-ranging effect in prompting 'corrective actions' than in provoking formal discipline.").

The *Isaacs* case had been assigned to the Judge after he requested a trial assignment from the United States District Court for the Central District of California, in accordance with the normal procedures of the District Court in assigning cases for trial by visiting judges. Of the *Isaacs* assignment, the Judge testified, "I accepted it without giving much thought of what the case was about. In other words, I did not ask for this particular case, and I had no idea that [it] existed until [the district judge] sent it to me. It was sent in the normal course, as we've done every year."

The Special Committee independently verified that the *Isaacs* case was not specifically requested by the Judge and was assigned to him in the regular course of the District Court's procedure.

B.

The *Isaacs* case was assigned to the Judge after he requested a trial assignment from the United States District Court for the Central District of California, consistent with the Judge's longstanding practice and in the regular course of the District Court's procedure. As noted, the Special Committee independently verified that the *Isaacs* case was not specifically requested by the Judge. With respect to the interruption of the *Isaacs* trial, the Judge testified, "I take full responsibility for that unfortunate event and the disruption this caused to the defendant, the Government, and individuals who were selected to serve on the jury in the *Isaacs* case." "For this, I am very, very sorry, and extend my sincerest apology."

37

Neither the Judge's assignment to, nor his decision to recuse himself from, the *Isaacs* case constituted conduct cognizable under the Act. Accordingly, the identified Complaint will be dismissed to the extent it involves the Judge's conduct with respect to the *Isaacs* case.[13]

VI.

With respect to the identified Complaint involving alex.kozinski.com, the proceeding will be concluded under Rule 20(b)(1)(B) because appropriate corrective action has been taken. To the extent the identified Complaint involves the Judge's conduct with respect to the *United States v. Isaacs* case, that portion of the identified Complaint will be dismissed under Rule 20(b)(1)(A)(i). An appropriate Order follows.

/s/ Anthony J. Scirica
Anthony J. Scirica, Chief Judge
United States Court of Appeals
for the Third Circuit

Dated: June 5, 2009

---

[13] Any allegation of misconduct relating to the Judge's recusal decision in *Isaacs* would properly be dismissed for an additional reason. Absent special circumstances such as racial or ethnic bias, not present here, a judge's recusal decision is merits-related and, as such, is not a subject for determination under judicial misconduct rules. Rule 3(h)(3)(A). Under 28 U.S.C. § 352(b)(1)(A)(ii), a complaint that is "directly related to the merits of a decision or procedural ruling" is subject to dismissal. *See* Rule 11(c)(1)(B). Rule 3(h)(3)(A) provides: "An allegation that calls into question the correctness of a judge's ruling, including a failure to recuse, without more, is merits-related."

JUDICIAL COUNCIL OF THE THIRD CIRCUIT
_____

J.C. No. 03-08-90050
_____

IN RE: COMPLAINT OF JUDICIAL MISCONDUCT
_____

ORIGINAL PROCEEDINGS UNDER 28 U.S.C. § 351

TRANSFERRED FROM JUDICIAL COUNCIL OF THE NINTH CIRCUIT
(J.C. No. 09-08-90035)
_____

O R D E R
_____

(Filed: June 5, 2009)

Present: SCIRICA, *Chief Judge*, SLOVITER, McKEE, RENDELL, BARRY, AMBRO, AMBROSE, BROWN, BARTLE, KANE, and SLEET, *Members of the Judicial Council.*

SCIRICA, *Chief Judge.*

After consideration of the Report and Recommendation of the Special Committee and the record and on the basis of the foregoing Memorandum Opinion entered on this date, it is ORDERED AND ADJUDGED that the Complaint identified pursuant to 28 U.S.C. § 351 and Rule 5 of the *Rules for Judicial-Conduct and Judicial-Disability Proceedings* is hereby: concluded in part pursuant to Rule 20(b)(1)(B) of the *Rules for Judicial-Conduct and Judicial-Disability Proceedings*, and dismissed in part pursuant to Rule 20(b)(1)(A)(i) of the *Rules for Judicial-Conduct and Judicial-Disability Proceedings*.

Respondent is notified that this Order constitutes the final order of the Judicial Council under 28 U.S.C. § 354 and is conclusive and not subject to further review by the Judicial Council and is not judicially reviewable on appeal or otherwise except as provided by 28 U.S.C. § 357(a).

In accordance with 28 U.S.C. 357(a), "[a] complainant or judge aggrieved by an action of the judicial council under section 354 may petition the Judicial Conference of the United States for review thereof." The procedure for seeking review by the Judicial Conference Committee on Judicial Conduct and Disability is specified by Rules 21 and 22 of the *Rules for Judicial-Conduct and Judicial-Disability Proceedings.* The full text of the *Rules for Judicial-Conduct and Judicial-Disability Proceedings* is available from the Clerk's Office of the Court of Appeals for the Third Circuit and on the Court of Appeals Internet site, www.ca3.uscourts.gov.

/s/ Anthony J. Scirica
Anthony J. Scirica, Chief Judge
United States Court of Appeals
for the Third Circuit

Dated: June 5, 2009

JUDICIAL COUNCIL OF THE THIRD CIRCUIT

_____

J.C. No. 03-08-90050

_____

IN RE:  COMPLAINT OF JUDICIAL MISCONDUCT

_____

ORIGINAL PROCEEDINGS UNDER 28 U.S.C. § 351

TRANSFERRED FROM JUDICIAL COUNCIL OF THE NINTH CIRCUIT
(J.C. No. 09-08-90035)

_____

O R D E R

_____

(Filed: July 2, 2009)

SCIRICA, *Chief Judge*.

Pursuant to Rule 24(a) of the *Rules for Judicial-Conduct and Judicial-Disability Proceedings*, because "final action has been taken on [the] complaint and it is no longer subject to review," the Memorandum Opinion and Order filed by the Judicial Council of the Third Circuit in the above-captioned matter is hereby made public.

/s/ Anthony J. Scirica
Anthony J. Scirica, Chief Judge
United States Court of Appeals
for the Third Circuit

Dated: July 2, 2009